### THE LIZZIE HENDERSON.

*(District Court, S. D. Florida.  1884.)*

1. COLLISION—WEIGHT OF EVIDENCE.
     Where 11 witnesses are so situated that they cannot be mistaken in regard to a fact to which they testify, and their testimony is to a positive fact, the weight of evidence is in favor of that fact, although other disinterested witnesses contradict it, testifying to a negative fact, there being ground for believing that they might have been mistaken.

2. SAME—SECTION 4234, REV. ST.—VESSEL AT ANCHOR.
     A sailing vessel at anchor must show a torch-light upon the approach of a steamer, under section 4234, Rev. St., and a failure to do so is negligence.

3. SAME—DUTIES OF VESSELS—LOSS APPORTIONED.
     It is the duty of a steamer to avoid a sailing vessel, but it is also the duty of the latter to afford the steamer all the means and signals the law, custom, and common prudence prescribe, to enable her to make the avoidance; and if, by a failure so to do, disaster occurs, she must bear the loss or a share thereof, according as the collision resulted from her sole or partial fault.

4. INTERPRETATION OF STATUTES.
     Statutes are to be interpreted according to the manifest import of their words, and that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and object of the legislation, must be adopted.

In Admiralty. Collision.

*L. W. Bethel* and *G. Bowne Patterson,* for libelant.

*S. M. Sparkman* and *W. C. Maloney, Jr.,* for respondent.

LOCKE, J. The steam-ship Lizzie Henderson, while coming out of the harbor of Cedar Keys on the evening of September 5, 1880, struck the schooner Competitor, lying at anchor in the channel, and this is a libel to recover damages. One vessel was a steamer under

way; the other, a sailing vessel at anchor. The collision is admitted and fully proven, and the steamer, *prima facie*, so in fault that the burden of proof is upon respondent to show fault in the schooner.

In defense, it is urged that the schooner was anchored in an improper place; that she had no lights up; that she exhibited no lighted torch upon the approach of the steamer. Upon the first two grounds, as questions of fact, the testimony is directly contradictory, and by such a number of witnesses on each side, whom I have no reason, aside from the discrepancies in the testimony, to doubt, that it is impossible to determine the true state of the case with any degree of satisfaction. The schooner had been ordered to quarantine, and instead of anchoring to the eastward of the buoy which marked the limit of the quarantine ground, had anchored to the westward of it, in the channel. This was about 300 or 350 yards wide within the 12-foot mark lines. Just how far from the buoy the schooner was anchored is uncertain; the witnesses have varied from 35 yards to 200, but there was ample room for any other vessel to pass. It does not appear to have been neglect in the master of the schooner in anchoring where he did, but a misunderstanding as to the location of the quarantine ground, from the directions given him by the quarantine officer. It is not a question of importance in this case whether the Competitor was actually within the limits of the quarantine grounds, any further than to inquire whether she was anchored in an improper place, regardless of any quarantine.

In the case of *The S. Shaw*, 6 FED. REP. 93, there was a statute positively forbidding anchoring where she was in range of the lights, but there was no such rule of law or custom prohibiting anchoring here. The Competitor was prevented from anchoring near the wharf, the usual anchorage for vessels, and although the master of the steamer says it is not customary for small vessels to anchor in this part of the channel, if sufficient space is left for vessels to pass safely, such anchoring only required more diligent watchfulness and care in warning any approaching vessel. Although the Competitor was anchored between the banks of the channel, I do not consider that she was so in mid-channel as to be in fault, if she complied with the law in other respects. There was unquestionably abundant room for any vessel to pass her, and no unusual or strong current making navigation difficult, or any obstacle to prevent her being seen from a distance.

According to the testimony of Jackson, master of the steam-ship, when compared with the chart, she was 100 yards to the eastward of the sailing line, as shown by the same. But she was not so out of the way of passing vessels as to excuse her from the maintenance of the required lights, but was so anchored as to make such lights and an anchor watch an imperative necessity; and here arises a more difficult question. Eleven witnesses, the officers and crew of the Competitor, as well as the entire officers and crew of the Nonpariel, a

schooner lying within speaking distance, but about 100 yards from her, swear positively that the Competitor had a large, bright light up at the jib-lift. One party testifies to putting it up; another to having ordered and seen it put up; and all to having seen it burning, bright and clear, until the schooner was struck by the steamer, when the lamp fell out of the lantern on the deck. Two pilots, anchored some 300 yards away, the master, first and second mates, and quartermaster of the steamer, and two passengers on board her, state as positively that they saw no lights, and are confident none were shown. This conflicting evidence renders a satisfactory conclusion difficult, if not impossible, and the only thing that presents itself from which one can be assisted, is the consideration of the opportunities and facilities of each party of being thoroughly informed upon the subject testified to. No one of them is pecuniarily interested in the result of this case, and I know of no reason why as full confidence should not be given to the testimony of each one as to that of any other. Let us see if there is any way by which the difference can be accounted for. The steamer was going at the rate of eight miles an hour, under full head of steam and sail, or at the rate of 204 yards a minute. According to the most reliable testimony the schooner was not seen until the steamer was within about 80 feet of her, or some seven or eight seconds of time. The excitement and commotion at the time is testified to. The master ran to the wheel to help the man there; the mate, who was coming from aft, when he heard the outcry, rushed aft again to cast off the main-sheet; the second mate was abaft the pilot-house when he heard the commotion; and it may well be believed that none of them got more than a passing glimpse of the schooner until they struck her. The passengers were neither seafaring men, nor probably conversant with vessels or the requirements of lights. The testimony of one shows that he was mistaken as to the light on the Nonpariel, a vessel lying at a short distance, and the other saw but one vessel anchored near, while it is true there were two, both with lights distinctly visible. Everything goes to show that the steamer was running what they considered her course from the last buoy, and no one was thinking of a vessel in their way until just upon her. It was a bright moonlight night, without a cloud in the sky, within two days of full moon, the moon a little over two hours high, and the schooner so heading as to be in the full light of the moon, and there was no possible reason why she could not have been seen a half mile under the circumstances, without any light. The two pilots say they had seen her distinctly 300 or 400 yards, when they saw no lights, and to argue that she had no lights because they had not been seen by those on board the steamer when within visual distance, would equally prove that she was not there because they had not seen her. It is stated in evidence that there were good and careful men on lookout,—one in the rigging and one on the bows. While I would not deny their being there, the fact

that they did not see the schooner until she had been seen and announced by a passenger, does not show great care on their part.

It may be easily understood that in such a moment of excitement as has been shown to have been existing here, every one would be watching the schooner and where she would be struck, if at all, and take no such thought of a light as to notice it; and, had no collision occurred, been unable to say five minutes later whether she had a light or not. The testimony of the two pilots, Clark and Wilson, has been more difficult to account for, as it must be, unless the position is accepted that each one of the 11 witnesses for the libelant committed perjury. These libelant's witnesses were so situated that they could not have been mistaken. They were, a part of them, actors in furnishing the light, and all others so immediately in the vicinity that they must have known of its presence or its absence. They testified directly to a positive fact, and not to a negative one; and there can be but one of two conclusions: either that there was a light as described, or they have every one committed willful perjury, which I am not ready to accept. Can we find any grounds for thinking Clark and Wilson may have been honestly mistaken in their statements? The Competitor was nearly easterly from the Grace Darling, the pilot's vessel; almost in a direct line with a rising or newly-risen moon of full brilliancy. She was nearly stern on to them, and the fact that they might have noticed her once, or several times, even, when the light, obscured by the schooner's masts or rigging, or dimmed by the brightness of the moon, was not seen, would not be as improbable as that 11 men of presumably good reputation and character, with no inducement to false swearing, would have committed perjury. A light that was brought from the cabin and carried forward, as testified to by Clark, is conclusively shown by the testimony of those on board the steamer, as well as others, to have been after rather than before the collision, as stated. Taking the entire evidence as to the anchor-light together, I consider the weight is in favor of there being one, and I must so believe.

So far the questions have been of fact, but one of law is now presented. It is claimed and admitted that no torch-light was shown upon the approach of the steamer, as is required by section 4234, Rev. St., according to the act of February 28, 1871. In behalf of the libelant it is urged that such requirement is not for vessels at anchor, but is only intended to apply to sail-vessels under way; and this view seems to be supported by implication by the decisions in *McClosky* v. *The Achilles*, 23 Int. Rev. Rec. 368, and *The Wanata*, 95 U. S. 600; also, *The Sarmatia*, 2 FED. REP. 915, which have been cited. But in none of these does the question at bar seem to have been considered and determined, for in *The Achilles* only were the circumstances such as could have raised it, and in that it does not appear to have been mentioned. On the other hand, in *U. S.* v. *One Raft, etc.*, 13 FED. REP. 796, Judge BOND's opinion would imply that

a raft should display a torch, notwithstanding she was at anchor, although the case was disposed of on other grounds; and in *McGill* v. *The Oscar Townsend*, 17 FED. REP. 94, Judge WELKER remarked that "she did not display, as it was her duty, a torch-light when the lights of the Townshend first appeared, to enable them to see her and avoid a collision."

The language of the law is sufficiently extended to include anchored vessels, as well as those under way, and it must require good reasons to limit its application. As a safeguard, intended to prevent collisions, it would seem to demand as liberal a construction as could be consistent with the plainly-expressed opinion of the legislators. The act of 1871, in which this provision was embodied, was for the purpose of providing in every way possible for the safety of life and property on board steam-vessels, and may it not be presumed with reason that the legislators intended it as much for the protection of these as for the safety of the sailing vessel, and to apply as well to vessels at anchor, which might be impediments to navigation, as to those under way? Judge LOWELL seems to have taken this view of it in the case of *The Leopard*, 2 Low. 242, where he remarks: "I suppose this regulation was intended to give a warning to steamers in case of need, and one the use or neglect of which could not well be disputed." The board of supervising inspectors of steam-vessels place the same construction upon it, as in page 42 of the rules and regulations it is stated that sailing vessels shall at all times, on the approach of any steamer during the night, show a lighted torch. It is plain that the torch is designated by the law as a warning for approaching steamers; every sailing vessel is bound by law to have one at hand, and be acquainted with the requirements and use of it; and, under the circumstances, I cannot say that because the vessel was at anchor, her master was justified in neglecting the use of it. It might be urged that it was presumed that the steamer would do her duty and avoid the schooner, but such presumption cannot be relied upon until everything has been done that can be. I have no doubt that had the torch been displayed five, or even three, minutes before the collision, or even one minute, it would have been seen, and the damage avoided.

In *The Golden Grove*, 13 FED. REP. 675, the following language so fully expresses the duty of sail-vessels that I adopt it as applying here:

"While it is true that it is the duty of the steam-vessel to avoid the sailing vessel, it is no less the duty of the latter to afford the steamer all the means and signals the law, custom, and common prudence prescribe, to enable her to make the avoidance; and if, in any respect, she fails therein, and thereby produces the disaster, she must either bear the whole loss, or share thereof, as her fault was the sole or partial cause of the collision."

Considering the place in which the schooner was anchored, and the entire circumstances of the case, I must decide that it was the duty

of those on board the schooner to show a torch as provided by the statute, and not doing so was a neglect on their part.

I am not sufficiently well satisfied that it was not the intention of the legislators to have the law apply to such cases, to give an opinion in direct conflict with those already given upon the same question. In interpreting statutes "we are bound to interpret them according to the manifest import of the words, and to hold all cases which are within the words and mischiefs to be within the remedial influence of the statute;" "we must adopt the sense of the words which harmonize best with the context and promote in the fullest manner the apparent policy and object of the legislation." *U. S.* v. *One Raft*, 13 FED. REP. 796; citing *U. S.* v. *Winn*, 3 Sumn. 212; *The Enterprise*, 1 Paine, 33; *The Industry*, 1 Gall. 117. This case certainly comes within the words of the statute, and would have been remedied by an application of its provisions. If congress has neglected to provide that steam-vessels under like circumstances should comply with like requirements, it does not necessarily relieve those to which it does apply.

But while the Competitor was in this matter, in my opinion, in fault, I am none the less satisfied that there was culpable negligence on the part of the steamer. The circumstances fully satisfy me that with a reasonable degree of diligence and care the schooner would have been seen and avoided, notwithstanding the absence of a torch-light.

Each vessel was, in my opinion, in fault, and the damage must be divided between them. The decree, therefore, will follow for half damages to the Competitor.