In re MONEYS IN REGISTRY OF DISTRICT COURT.

(District Court, E. D. Pennsylvania.    May 20, 1909.)

Nos. 1872, 1791, and 4.

1. DEPOSITS IN COURT (§ 11*)—DISPOSITION OF UNCLAIMED DEPOSITS—FEDERAL
STATUTE.
    Under the provision of Rev. St. § 996, as amended by Act Feb. 19, 1897,
    c. 265, § 3, 29 Stat. 578 (U. S. Comp. St. 1901, p. 711), that it shall be the
    duty of the judge or judges of the respective federal courts to cause any
    moneys which have remained in the registry of the court unclaimed for
    10 years or longer to be deposited in a designated depository of the United
    States to the credit of the United States, after a fund has remained in its
    registry unclaimed for 10 years or more the court has no power to then
    award it to a claimant, but can only follow the statute, and any claim
    must be presented to the Treasury Department.
    [Ed. Note.—For other cases, see Deposits in Court, Cent. Dig. § 12; Dec.
    Dig. § 11.*]

2. SALVAGE (§ 28*)—DERELICT PROPERTY—RIGHTS OF SALVOR.
    A salvor of derelict property found at sea who took the same to a
    court of admiralty and libeled it for salvage, claiming the entire proceeds,
    but was awarded a moiety only, the remainder being deposited in the
    registry of the court subject to its orders, is entitled to such balance
    where, after the lapse of a number of years, no owner or claimant of
    the property has appeared.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. § 69; Dec. Dig. §
    28.*
    Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

On Exceptions to Report of Special Commissioner.

Walter C. Douglas, Jr., and J. Whitaker Thompson, for the United States.

James F. Campbell, for certain claimant.

J. B. McPHERSON, District Judge.    In January, 1908, upon petition of the United States attorney representing that certain funds had been in the registry of the District Court unclaimed for more than 10 years, and asking that an order might direct their payment to the United States, a commissioner (Edward F. Pugh, Esq.) was appointed "to ascertain and report the status of each case, as also what disposition, if any, should be made of the funds in the registry therein, with authority to make such advertisements and conduct such correspondence as he may think most likely to ascertain the persons entitled to the funds in the respective cases."    The commissioner made a careful and painstaking inquiry concerning each of the funds, and his report is now before the court.    In all of the cases except three he reported that the money should be paid into the treasury, and no objection has been urged to these recommendations.    In each of the three instances referred to he awarded the fund to the claimants, and in this respect his recommendations have been brought up by the government for review.

Two of the funds came into existence under Bankr. Act March 2,

1867, 14 Stat. 517, c. 176, and the report of the commissioner thereon is as follows:

"William A. Knight, Bankrupt, 1867, No. 1872.

"This was an involuntary petition filed in 1875. A composition with creditors was made by the bankrupt, which was approved by the register and by the court; and the property was reconveyed to the bankrupt July 21, 1875. Such creditors as the bankrupt could settle with personally were so settled with, but in obedience to the orders of the court sundry sums of money were paid in by him for creditors not then accessible, all of which have been paid to the persons entitled, except the sum of $8.70, which was the percentage due on a certain due bill of $29, given by the bankrupt to one William E. Patton of Germantown, but then held by a person unknown to the bankrupt. This person never proved his debt, nor did he make any claim to the money. In the opinion of the commissioner, therefore, it belongs to the bankrupt.

"The commissioner notified William Knight Shryock, Esq., attorney for the bankrupt, by letter of October 21, 1908, hereto annexed, marked 'Exhibit G,' and on November 4, 1908, was attended by William A. Shryock, Esq., who presented letters testamentary upon the estate of William A. Knight, deceased, granted to Lucy Worden Knight, Edith H., Amos K., and Helen Knight, executors (which letters were granted by the register of wills of Philadelphia, August 18, 1908), and on their behalf made claim to the balance in court, which the commissioner thinks should be awarded to them, and it is so awarded."

"Jonathan Lodge, Bankruptcy of 1867. No. 1791.

"A petition in bankruptcy was filed in 1875. The bankrupt made a composition with his creditors which was approved by the register and by the court May 12, 1876, all of the creditors assenting except the following: William McCrone, John S. Lear & Co., John McGovern, George Lawton & Co., and William Bowker. The settlement having been approved on December 27, 1876, it was ordered that the unassenting creditors be directed to accept the compromise of 25% cash and 50% in notes of the bankrupt, as follows:

|  | Claim. | Cash. | Jdgt. Note. |
|---|---|---|---|
| William McCrone | $ 65 52 | $16 38 | $32 76 |
| John S. Lear & Co. | 3 00 | 1 75 | 1 50 |
| John McGovern | 10 00 | 2 50 | 5 00 |
| George Lawton & Co. | 136 36 | 34 09 | 68 13 |
| William Bowker | 27 50 | 6 88 | 13 76 |
|  |  | $60 60 |  |

"The $60.60 was paid into the registry, and the estate was reconveyed to the bankrupt.

"Subsequently, to wit, November 26, 1879, William McCrone appeared, accepted and received his $16.38, leaving in the registry a balance of $44.22. There was testimony that diligent search was made in December, 1876, for John S. Lear & Co., John McGovern, George Lawton & Co., and William Bowker, but that they could not be found. They did not prove their claims in the bankruptcy proceeding. Therefore they can hardly be considered creditors, especially after so great a length of time, and the fund is really the property of the bankrupt.

"This matter appears in the advertisement above mentioned, Exhibit C, and the commissioner also notified George S. Graham, Esq., attorney of record for the bankrupt, of a meeting to be held November 2, 1908, at 3 o'clock. Mr. Graham sent word requesting an adjournment until November 9, 1908, at 3 o'clock, at which time a meeting was held and Mr. Graham asked another adjournment. He subsequently appeared, and it was shown that Jonathan Lodge died intestate January 14, 1906, leaving no estate, so that no letters of administration were taken. Three children survived him, viz., William B. Lodge, Mary Watson, and James Lodge, represented by Mr. Graham.

"Under the circumstances, more than two years having elapsed since the death of Jonathan Lodge, the commissioner thinks that the fund should be

paid to George S. Graham, Esq., as attorney for the estate of Jonathan Lodge, deceased, and it is so awarded."

I agree with the commissioner in believing that these two sums of money belong in equity to the persons to whom he has awarded them respectively, but in my opinion I have no power to order the payment. The present proceeding is taken under sections 995 and 996 of the Revised Statutes, as amended by Act Feb. 19, 1897, c. 265, § 3, 29 Stat. 578 (U. S. Comp. St. 1901, p. 711), and these sections read as follows:

"995. All moneys paid into any court of the United States or received by the officers thereof in any case pending or adjudicated in such court shall be forthwith deposited with the Treasurer or Assistant Treasurer or a designated depository of the United States in the name and to the credit of such court, provided that nothing herein shall be construed to prevent the delivery of any such money upon security according to agreement of parties under the direction of the court.

"996 (as amended). No money deposited as aforesaid shall be withdrawn except by order of the judge or judges of said courts, respectively, in term time or in vacation to be signed by such judge or judges and to be entered and certified of record by the clerk, and every such order shall state the cause in or on account of which it is drawn, and it shall be the duty of the judge or judges of said courts, respectively, to cause any moneys deposited as aforesaid which have remained in the registry of the court unclaimed for ten years or longer to be deposited in a designated depository of the United States to the credit of the United States."

Section 996 does not attempt to forfeit or escheat the money described therein; it merely changes the depository. Instead of allowing the fund to remain in the registry of the court, the money is to be "deposited in a designated depository to the credit of the United States." So far as appears, this is (in theory at least) no more than a substitution of depositories, or a change in the name to which the fund is to be credited, and does not in any manner affect the right of the true owner to pursue his claim upon the money. Instead of coming into court, however, he must now deal with the treasury, and no doubt the practical result of the substitution, especially where only small sums are concerned, will be to give to the United States the perpetual use of the sums so transferred. But I am not concerned with the practical effect of the statute. Its meaning seems to be clear, and I am bound to obey its direction. So far, therefore, as these two small funds are concerned, I think I have no option in the matter. They were paid into court in 1875 and 1876 for the express use of the credtors named, and no claim has ever been made for them, either by these creditors or on behalf of the respective bankrupts, until a few months ago. Equitably they may belong to the estate of the bankrupts, but they have "remained in the registry of the court unclaimed for ten years or longer," and it is therefore my duty to direct them to be transferred to the credit of the United States.

The remaining fund stands upon a different footing, as will appear by the following quotation from the commissioner's report:

"Twenty Bales of Cotton—Admiralty—No. 4 of 1880.

"On January 16, 1880, the steamship Allentown, belonging to the Philadelphia & Reading Railroad Company, picked up at sea, about 30 miles S. W. of Key West, 20 bales of cotton floating on the water. Apparently no vessel

was near by. The cotton was brought to Philadelphia, libeled for salvage, and sold by the marshal on February 26, 1880, for $1,052.62, leaving a balance in the registry (after payment of costs) of $910.

"April 28, 1880, the court awarded to and distributed money among the libelants, one-half of the fund, to wit, $455; retaining in the registry the other half, to wit, $455, which was directed to be and remain in the registry subject to the further order of the court.

"It was supposed, when the libel was filed, that all of the bales were unmarked, the marks having apparently been obliterated from the effect of the sea water, the exterior being defaced and torn; but on a careful survey under order of the court, upon two of the bales were found marks, being apparently C. H. W.
K.

"The commissioner sent a notice to the district attorney and also to the general solicitor of the Philadelphia & Reading Railroad Company. On Monday, October 19, 1908, the commissioner was attended by Walter C. Douglas, Jr., Esq., assistant U. S. district attorney, and James F. Campbell, Esq., attorney for the Reading Railroad Company, both of whom claimed the entire fund, and sustained their respective contentions by both oral and written arguments.

"The commissioner believed that it was his duty to endeavor to find the owners of the cotton, and thought it possible that it had been shipped originally from one of the Gulf ports. He therefore caused advertisements to be inserted in the Times Despatch of New Orleans, the Ledger of Mobile, Ala., and the News of Galveston, Tex. A copy of such advertisement is hereto annexed, marked 'Exhibit H.' The commissioner has received no reply to the advertisements, and is obliged to report, therefore, that he has been unable to ascertain who were the owners of the cotton.

"The question whether the fund should be paid to the United States or to the salvors (the owners not having appeared or made claim to it) is not free from difficulty.

"The cotton was found floating at sea, not far from the coast at Key West, in the path of vessels bound to or from any of the Gulf ports. It must have formed part of the cargo of a vessel (no doubt from a Gulf port) from which it had been jettisoned, or which, having been wrecked or having foundered, had become a partial or total loss. The marks on some of the bales, though indistinct, were not entirely obliterated. Probably the cotton had been insured and was abandoned by the owners to the underwriters, but, whether it had or not, the owners or underwriters, or both, must have known by what vessel it had been shipped—whether she came safely to port with part of her cargo, or whether vessel and cargo were lost.

"In either case they were put upon inquiry as to what had become of their cotton. So far as is known, they made none. They did not appear before the court in the salvage suit; nor have they appeared before the commissioner, in answer to his advertisements. May it not be said, therefore, that they abandoned their property, to all intents and purposes?

"The libel alleges that the libelants are entitled to salvage, and 'also, if, upon due course of proceeding, no owner or owners shall appear and prove title to the said twenty bales of cotton, to the whole remaining portion thereof, or of the proceeds of sale thereof.'

"The decree awards and apportions 50 per cent. salvage, and orders that 'the remaining half of the net fund in the registry, to wit, $455, be and remain in the registry of the court, subject to the future order of the court.' It is therefore still entirely within the court's control.

"It appears, then, that the salvors originally claimed the whole fund. They have not withdrawn this claim, but on the contrary they renew it before the commissioner; so that it can hardly be said, literally, that the fund has remained in the registry 'unclaimed.' The real question is whether the court ought or ought not to adjudge the fund to the salvors under the circumstances of the case.

"Some traces of the old doctrine that all unclaimed chattels found at sea belong to the United States as the successor of the right of the King are found in the earlier cases. It was so decided by Judge Davis in Massachusetts, in 1820, in the case of Peabody v. Proceeds of 28 Bales of Cotton, Fed. Cas. No.

10,869. In that case the surplus over the salvage was denied to the salvors and awarded to the United States. This, however, was not the practice in Pennsylvania, nor it is believed, in some of the other districts.

"In 1820, the case of Hollingsworth v. Doubloons, Fed. Cas. No. 6,620, Judge Peters had decided that where remnants of a chest, in which were some gold pieces, were found floating at sea, the finders were entitled to salvage, but that the residue should be deposited in court for a year and a day, subject to any legal claims; and, if no such claims should be interposed, the fund was to be disposed of agreeably to the future order and decree of the court.

"The commissioner has examined the original record in this case, and finds that, after the expiration of the year and a day, the court decreed that the residue of the fund be paid to the libelants (the salvors) or to their attorney of record; and it was so paid.

"In Russell v. 40 Bales of Cotton, Fed. Cas. No. 12,154, Judge Locke held in 1872, in a very elaborate and careful opinion, that after the expiration of a suitable time, ordinarily a year and a day, the residue of any fund remaining after the payment of costs and proper salvage, would usually be paid to the salvors, upon the ground that the lapse of time was sufficient to raise a presumption of abandonment by the owners, and that such delivery should be absolute unless the court should think it probable that some claim would be made thereafter, in which case a refunding bond might be required from the salvors.

"The opinion reviews many decisions and text-writers.

"The decision was affirmed by the Circuit Court in a per curiam opinion.

"This is the view of the law taken by Mr. Parsons in his work on Maritime Law, vol. 2, p. 617, to wit, that the balance should be held for a year and a day, and, if no owners then appeared, it should be paid to the finder.

"And by Judge Marvin, Wreck and Salvage, p. 143.

"If a year and a day was considered a sufficient time to bar owners years ago, when the means of communication and information were not as perfect as they are today, surely the 28 years which had elapsed in the present cause ought to be sufficient presumption against them.

"The same general principle was announced by the Court of Appeals of Ohio, in 1843, in the case of Wyman v. Hurlburt, 12 Ohio, 81, 40 Am. Dec. 461, in which it appears that a schooner containing some specie was sunk in Lake Erie and so remained about nine months. The jury found that it had been abandoned; and the court awarded the whole proceeds to the finders, denying the claim of the former owners.

"When this case was decided, the admiralty jurisdiction had not been extended over the Great Lakes.

"It is true undoubtedly that, under the ordinary circumstances, salvors, as such, will not be awarded the whole fund. Perhaps the strongest case on this point is The Felix (D. C.) 62 Fed. 620, where the salvors were awarded but a part of the fund, although it was shown that the expenses had exceeded greatly the value of the salved property. But in this and similar cases the owners appeared, contested the demand of the salvors, and claimed the residue, upon the ground that, if it should be awarded to the salvors, the vessel owners would have received no benefit from the work, which is of the essence of salvage.

"There have been cases where the value of the property saved was small, and there was no appearance or contest by owners, where the court by its original decree has awarded to the salvors the entire fund. The Zealand, Fed. Cas. No. 18,205; The Carl Schurz, Fed. Cas. No. 2,414; The Cairnsmore (D. C.) 20 Fed. 524.

"The matter may be looked at from another point of view.

"There is nothing of especial mystery or sanctity in personal property lost at sea. Why should it differ from any other personal property?

"Ever since the world became sufficiently civilized to see that the King or the lord of the manor ought not to be allowed to appropriate what he pleased, it has been the law that, where goods are lost and the owner does not reclaim them, they belong to the finder. 1 Blackst. Com. (2d Ed.) 9; 2 Kent's Com. 290.

"Or as it is stated more accurately, 'the finder of personal property who takes it into his possession thereby acquires, by occupancy, a special prop-

erty in it, which is valid against all the world except the true owners.' Brantly on Per. Property, § 127; Bouvier's Law Dict. tit. 'Finder.'

"Nor is the title affected by the place of finding.

"For example (in the absence of special regulations, or acts of assembly), a railroad conductor is entitled to money found by him in the car, as against the railroad company, especially where advertisement has been made and no claimant has appeared. Tatum v. Sharpless, 6 Phila. (Pa.) 18 (1865).

"And a servant in a hotel as against the proprietor. Hamaker v. Blanchard, 90 Pa. 377, 35 Am. Rep. 664.

"The finder may maintain trover against a third party who has become possessed of the article, and the latter may not set up the title of the true owner. Harker v. Dement, 9 Gill (Md.) 7, 52 Am. Dec. 670.

"No doubt it was the duty of the Allentown to bring this cotton to Philadelphia; and perhaps it was her duty to libel it for salvage, rather than to hold or to sell it. At all events, it was quite proper for her to take this course. It was fair to her crew, and to the unknown owners of the cotton. But why should she be considered as forfeiting her rights by doing so? Her owners have always claimed the whole fund, for themselves and their associates, and, in the opinion of the commissioner, they are entitled to it.

"Nor is it necessary that the court should go into this question at present, as to who are entitled to have the balance. The libel was filed by the Philadelphia & Reading Railroad Company on their own behalf and on behalf of the crew of the Allentown. Their successors, the Philadelphia & Reading Railway Company, are before the court claiming the balance, which may well be awarded to them; they taking the responsibility of its distribution. If they should fail to account to any one entitled, doubtless such person would have a right of action against them. Andrews v. Wall, 3 How. 568, 11 L. Ed. 729.

"The commissioner reports, therefore, that the fund be awarded to the Philadelphia & Reading Railway Company, libelants, for themselves and other parties interested with them as salvors, and that it be paid to them, or to their proctor, James F. Campbell, Esq.; Thomas Hart, Jr., Esq., the original proctor of record, having died."

As will be observed, the salvor has always claimed the whole of the fund, and, while it is true that the question of its right to one-half has remained undecided for 28 years, there is nothing to show that the claim has ever been withdrawn or abandoned. As sometimes happens, the dispute was apparently forgotten both by the government and by the salvor; but as soon as the government moved again in the matter, the claimant also promptly resumed action, and has vigorously urged what is asserted to be its right. It is apparent, therefore, that the fund has not remained unclaimed in the registry of the court for 10 years or longer, and in strictness, therefore, the court may perhaps be stepping somewhat beyond the limit of section 996, as amended, in deciding in this proceeding upon the merits of the dispute. But the controversy should be brought to an end, and the decision may be treated as made in the original cause (No. 4 of 1880 in admiralty), where indeed it properly belongs. The learned commissioner's discussion of the legal question involved is satisfactory in every respect, and I adopt it as the opinion of the court. Unquestionably, as it seems to me, the weight of the American authorities supports the position that, unless the United States has somehow shown its intention to exercise whatever sovereign power it may possess over the proceeds of derelict property, the salvors are entitled to the whole of such proceeds against all the world except the original owners; and there is no serious contention on the part of the government that it has ever manifested any purpose to exercise such power. I may add, in reply to a faint suggestion in the brief, that

the purpose was certainly not manifested by the remote implication of section 996. That section, as I have already said, puts forward no claim to ownership by the government of the funds remaining unclaimed in the federal courts; it merely directs where they shall be deposited hereafter.

Appropriate decrees may be prepared in accordance with this opinion.